**VOSS INT. CORP.**

v.

**UNITED STATES.**

C.D. 3544;  Protests Nos. 63/21809(A)– 73344 and 64/20850–78683.

United States Customs Court, Second Division.
Aug. 21, 1968.

■■■■■■■■■■■■■■■■

———◆———

Glad & Tuttle, Los Angeles, Cal. (Robert Glenn White, Los Angeles, Cal., of counsel), for plaintiff.

Edwin L. Weisl, Jr., Asst. Atty. Gen. (Mollie Strum, New York City, trial attorney), for defendant.

Before RAO, Chief Judge, and FORD, and BECKWORTH, Judges.

BECKWORTH, Judge:

The merchandise involved in these cases, consolidated at the trial, consists of metal shower heads, imported from Japan and entered at the port of Los Angeles on April 3, 1961, and September 19, 1961. They were assessed with duty at 19 per centum ad valorem under paragraph 397 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, as articles in chief value of brass, not specially provided for. It is claimed that they are properly dutiable at 12½ per centum ad valorem under paragraph 339 of said tariff act, as modified, as household utensils in chief value of brass.

The pertinent provisions of the tariff act, as modified, are as follows:

Paragraph 397, as modified by T.D. 54108:

Articles or wares not specially provided for, whether partly or wholly manufactured:

\* \* \* \* \* \* \* \*

Composed wholly or in chief value of iron, steel, copper, brass, nickel, pewter, zinc, aluminum, or other base metal (except lead), but not plated with platinum, gold, or silver \* \* \*:

\* \* \* \* \* \* \* \*

Not wholly or in chief value of tin or tin plate:

\* \* \* \* \* \* \* \*

Other, composed wholly or in chief value of iron, steel, brass, bronze, zinc, or aluminum (except \* \* \*) .......... 19% ad val.

Paragraph 339, as modified by T.D. 54108:

Table, household, kitchen, and hospital utensils, and hollow or flat ware, not specially provided for, whether or not containing electrical heating elements as constituent parts:

\* \* \* \* \* \* \* \*

Not plated with platinum, gold, or silver, and not specially provided for, composed wholly or in chief value of:

Brass ...................... 12½% ad val.

———◆———

Four types of shower heads are involved herein, designated on the invoices as Model 303 2″ Showerheads, Model 302 3″ Showerheads, Model 301 4″ Showerheads, and 2″ C.P. Balljoint Showerheads, M–310 (New Type Showerheads).

Plaintiff introduced samples of the first three models into evidence as exhibits 1, 2, and 3, respectively. Joseph E. Bloomberg, plaintiff's general manager, testified that Model M–310 was of the same construction and material as the others but differed in the design of the body and the balljoint section. It was stipulated that the merchandise was in chief value of brass.

Mr. Bloomberg testified that the business of Voss International Corp. was the distribution and marketing of plumbing items and that he was the supervisor of marketing, distribution, purchase, and sale of all materials. He had been with Voss International for 8 years and had previously been supervisor of a chain of jewelry stores and president of an importing firm which manufactured and distributed plumbing items. He is not a plumber.

The witness said he was familiar with the items involved herein as it was part of his job to understand and know the merchandise which he purchased. He said that the internal construction of all of them was the same and that there was no basic difference, except for size and external styling, such as the adjusting handles. These shower heads have a side arm which adjusts the rate of flow of water so that the user can get a very fine spray or a very heavy flow of water through the shower. The arm also permits the shower to remain open so that water will not accumulate and cause a lot of lime and corrosion within the shower head, as is very common with ordinary nonadjustable shower heads. This feature was not common on shower heads 20 years ago.

The witness said he had installed one of the largest-sized shower heads (exhibit 3) in an existing shower in his own home by threading it onto the existing arm and tightening it. He used household pliers to do the work, not a wrench. It took him about a minute to remove the old head and about the same time to put on the new one. No damage was done to the shower fixture or the wall of the bathroom.

The witness explained that the shower head is not attached to the water pipe but to the shower arm which extends from the wall. The shower arm threads into the plumbing connection. There is an indentation on the outside of these shower heads which makes it convenient for pliers or a wrench to grasp the slippery surface.

According to Mr. Bloomberg, these shower heads will fit almost any water outlet through the United States. He said it was common practice for all shower heads to be made so as to fit any existing attachment.

The witness testified that he had had occasion to see how these shower heads were used, but gave no instances except as to the installation in his own home. He also said he had seen such items installed in new homes, but gave no details. He was asked:

Q. Would you say that these shower heads serve to enhance the convenience or comfort of a household dweller?

\* \* \* \* \* \*

A. Yes.

Mr. Bloomberg stated that Voss International sells these shower heads "all over the United States, regional area western United States, but we do some selling on the East Coast, down South and Texas." His firm sells through wholesale distributing channels, including the wholesale hardware industry, and also directly to retail establishments and to the wholesale plumbing industry. He said that the wholesale plumbing industry caters largely to contractors and that the wholesale hardware industry deals primarily with retail outlets or sells to the homeowner or consumer. He said that the greatest number of his sales have been in the wholesale hardware trade. He has personally seen these items for sale in department stores, hardware stores, plumbing shops,

golf pro shops, and men's stores. They are also sold in novelty gift departments. The largest size retails for $12.95 through $15.95; the middle size for $8.95 through $12.95; and the small size from $1.95 to $5.95.

According to Mr. Bloomberg, his firm puts out a list which depicts items which it sells, including shower heads, sink strainers, gate valves, and traps. He said it sells plumbing items, although that is only part of its business, and mentioned gate valves, steel pipe, sink traps, and gas valves. He defined plumbing items as those which would necessitate some technical knowledge in order to make installation, or within the jurisdiction of the plumbing code.

He was aware of the fact that the merchandise involved herein was invoiced as plumbing supplies but pointed out that the invoices were made by the manufacturer, a Japanese company. His firm had purchased other types of shower heads from this manufacturer. They did not have the adjustable feature for regulating the flow of water nor the balljoint feature which allows the head to be rotated. He had not installed any of them.

Plaintiff claims that these shower heads are dutiable as household utensils, citing Davies, Turner & Company v. United States, 47 CCPA 129, C.A.D. 744 (water mixers); United States v. Lipman's, 52 CCPA 59, C.A.D. 859 (hose nozzles); and Globe Importing Company v. United States, 47 Cust.Ct. 248, Abstract 65882 (aerators). It maintains that the chief use of these adjustable shower heads is in fact for the convenience and comfort of a household; that these articles may be attached with ease and without skill; that attachment and removal will not damage the existing shower arm or the wall; and that the articles are not fixtures.

Defendant contends that all articles for the convenience and comfort of a household are not household utensils for tariff purposes, and that these shower heads are plumbing equipment or fixtures and are not household utensils.

■ It is well settled that the term "household utensils" means utensils which are chiefly used in and around the house for the maintenance and care of the home or for the convenience and comfort of the members of the household. Frank P. Dow Co., Inc. v. United States, 21 CCPA 282, T.D. 46816; I. W. Rice & Co. v. United States, 24 CCPA 114, T.D. 48415; F. W. Woolworth Co. v. United States, 26 CCPA 221, C.A.D. 20; Pramette Juvenile Furniture Company v. United States, 36 CCPA 61, C.A.D. 398; United States v. Lipman's, supra.

The elements necessary to establish chief use are equally well established. See, for instance, Diamond Trading Co., Ltd., et al. v. United States, 54 Cust.Ct. 70, 74, C.D. 2510:

When the classification of merchandise is governed by use, the term "use" imports "chief use." United States v. The Baltimore & Ohio R. R. Co., supra; Bob Stone Cordage Co. et al. v. United States, 51 CCPA 60, 61, C.A.D. 838. Chief use is a question of actual fact which must be established on the basis of positive testimony representative of an adequate geographical cross-section of the country. L. Tobert Co., Inc., American Shipping Co. v. United States, 41 CCPA 161, 164, C.A.D. 544. While the testimony of a single competent witness may suffice, he must be qualified, and his testimony must be convincing and not negatived by the samples themselves. United States v. Perry, 25 CCPA 282, T.D. 49395; United States v. Gardel Industries, 33 CCPA 118, C.A.D. 325. Evidence of chief use in one state or one part of the country, standing alone, will not establish chief use throughout the United States. Pacific Guano & Fertilizer Co. et al. v. United States, 15 Ct.Cust.Appls. 218, T.D. 42240; United States v.

Spreckels Creameries, Inc., 17 CCPA 400, T.D. 43835.

■ Executives concerned with designing, framing specifications, ordering, importing, selling, distributing, and promoting an article have to know its chief uses and may properly give testimony as to such uses. F. B. Vandegrift & Co., Inc. v. United States, 56 Cust.Ct. 103, C.D. 2617; Davies Products, Inc., et al. v. United States, 59 Cust.Ct. 226, C.D. 3127; Inter Maritime Fwdg. Co., Inc. v. United States, 59 Cust.Ct. 412, C.D. 3177 (appeal 5304 dismissed May 6, 1968). However, the witness must have factual knowledge and experience to support his testimony. Royal Cathay Trading Co. et al. v. United States, 56 Cust. Ct. 371, C.D. 2662; W. J. Byrnes & Co. et al. v. United States, 57 Cust.Ct. 148, C.D. 2746.

In Viking Importrade, Inc. v. United States, 59 Cust.Ct. 137, C.D. 3096, it was held that testimony as to use which was limited to the witness' personal use and his observation of use in four or five homes and instructions to salesmen was insufficient to establish that the merchandise was chiefly used in the household.

W. J. Byrnes & Co. et al. v. United States, supra, involved barbecue tools or skewers said to be used with hibachi stoves. They were claimed to be household utensils. The experience of the witness was limited to sales to retailers in San Francisco. The court pointed out that there was no reason to think that the uses of hibachis were uniform nationally, and took judicial notice that hibachis and other portable grills may be used away from homes, in or about camps, parks, beaches, boats, restaurants, night clubs, and hotels. It held that plaintiff had failed to establish that either hibachis or barbecue tools or skewers were chiefly used in or around homes.

See also Thornley & Pitt et al. v. United States, 58 Cust.Ct. 500, C.D. 3027.

In the cases relied on by plaintiff, supra, on the other hand, there was evidence that the articles were chiefly used as household utensils.

■ In the instant case, Mr. Bloomberg testified that he had used one of these shower heads in his own home; that he had seen them used and that he had seen them in new homes. How often or in what part of the country he had made such observations was not stated. He was not asked whether he knew of any other uses for these shower heads. Whether or not he made sales throughout the United States or only in certain regions is not clear. There is no evidence as to the quantities his firm imported or sold or whether it was the only importer of such merchandise.

The court may take judicial notice that shower heads are used not only in homes but in hotels, motels, schools, country clubs, beaches, ships, etc. According to Mr. Bloomberg, the ones before the court would fit almost any existing shower in the country. There is nothing about their construction and design which make them suitable only for home use. In fact, the largest size seems too big for that purpose. The statement of the witness that the greatest number of his sales were to the wholesale hardware industry which sells to retail outlets, homeowners, and consumers does not establish that the merchandise was chiefly used as household utensils, particularly where there is no evidence that plaintiff was the sole or major seller in the United States.

On the record presented, we cannot hold that these shower heads are chiefly used in and around households. Since plaintiff has failed to establish this vital element of its case, the protests must be overruled. Judgment will be entered accordingly.